# FARMERS STATE BANK OF COLUMBUS, NORTH DAKOTA, a Corporation, Respondent, v. WILLIAM WISHART and Alice Wishart, Appellants.

### (204 N. W. 1.)

**Mortgages — evidence held to show that note and mortgage had been paid.**
    Evidence examined from which it is held that the note and mortgage, upon which foreclosure is sought in this action, were paid.

Opinion filed May 4, 1925.    Rehearing denied June 13, 1925.

Mortgages, 27 Cyc. p. 1398 n. 74.

In District Court, Burke County, *Moellring,* J.

Defendants have appealed from a decree of foreclosure and have demanded a trial de novo.

Reversed.

*George A. Bangs,* for appellants.

*Francis J. Murphy,* for respondent.

"The defense of payment being an affirmative one, the burden rests upon the defendant to sustain the same.

"The right of subrogation exists independently of contract and is equitable in its nature. It is a means by which justice may be accomplished by subrogation of one party to the rights of another in accordance with recognized principles of equity jurisprudence." Charmley v. Charmley (Wis.) 103 N. W. 1106; 3 Pom. Eq. Jur. 3d ed. § 1111, 1112; 1 Jones, Morg. 5th ed. p. 877. Also Savings Loan Asso. v. White, 31 N. D. 348.

"The law is that the taking of a new note does not operate to discharge the indebtedness unless it is agreed that the indebtedness should be discharged. The burden of establishing such an agreement is upon the party who asserts it. This rule is not altered by the fact that additional security is given for the new notes." Anderson v. Kain, 40 N. D. 637.

BURKE, J. This is an action to foreclose a real estate mortgage. The

complaint is in the usual statutory form. The plaintiff claims to be the owner of the mortgage by assignment and, of the note thereby secured. Defendant admits the execution and delivery of the mortgage but alleges that the same has been paid in full. That is the one question at issue under the pleadings. The trial court made its findings of fact and conclusions of law in favor of the plaintiff; that the allegation in the defendant's answer that the note and mortgage had been paid was not true; that the plaintiff had paid to Wells and Dickey Company, the original owner of the mortgage, the amount due thereon and thereby become entitled to an assignment of all the rights of the said Wells & Dickey Company in and to said mortgage; that the defendants William Wishart and Alice Wishart agreed that the said note and mortgage might be held by the said plaintiff as a pledge of indebtedness then owing to the plaintiff by the said William and Alice Wishart, and that as conclusions of law, the plaintiff was entitled to a foreclosure of the mortgage and the sale of the property in payment of the amount due thereon. Judgment was duly entered upon the findings of fact and conclusions of law, and the defendant appeals to this court and asks for a trial de novo.

The record shows that the trial court erred in finding number 12 wherein the court finds: "That William Wishart and Alice Wishart agreed that the said note and mortgage involved in this action be held by the said plaintiff as a pledge of indebtedness then owing to the plaintiff by the said defendants William and Alice Wishart." Alice Wishart was not a witness at the trial. She was not present at the annual settlements made between the plaintiff and the defendant William Wishart. No witness testified that she made any promise or pledge of any kind in connection with the so-called Wells & Dickey Company loan, or any other loan. The record is silent on the subject so far as the defendant Alice Wishart is concerned.

It appears from the record that the defendant William Wishart had been doing business with the plaintiff bank for a great many years; that he borrowed money at the bank at different times on his note. His credit was good. The note and mortgage in question was procured by the plaintiff bank as agent for the Wells & Dickey Company, a corporation. It became due in 1916 and the plaintiff bank, as agent for Wells & Dickey Company, secured an extension of one year. In

the fall of 1917 the plaintiff bank undertook to secure for the defendant William Wishart a loan upon four quarter-sections of land, which did not include the land mortgaged to Wells & Dickey Company, but did include three other quarter-sections of land owned by defendant William Wishart and one other quarter-section that he had purchased and known in this action as the Abbott land. Wishart testifies that he wanted this loan so that he could pay the Wells & Dickey loan and what he owed on the Abbott land. At this time William Wishart was in good financial standing at the bank.. Three quarter-sections of the land was free from encumbrance and he was mortgaging the whole section, he says, for the purpose of paying what he owed on the Abbott land and to take up the Wells & Dickey loan on his homestead; that he wanted his homestead clear and free from encumbrances. That is where he lived and where he had his buildings. George G. Keup, vice-president of the plaintiff bank, who did all the business with the defendant, corroborates him in this statement at times in his testimony. On page 85 of the transcript Mr. Keup says: "The only conversation we had with him (meaning defendant Wishart) was when we received a letter from Wells & Dickey Company threatening to foreclose on the 20th of January if it was not taken care of." On page 86 of the transcript:

Q. Nothing was said then by him, as to holding Exhibit 1 as collateral to Exhibit 7?

A. It was to be held as collateral until we got his other loan through or until he paid it up.

This relates to the time when Wells & Dickey Company was asking for their money and the loan that the plaintiff bank was to procure for the defendant was not perfected but was at that time well under way. Keup says that this was the only conversation that he ever had with the defendant about the matter and that the Wells & Dickey Company loan was to be held by them as collateral until this new loan was made or until the defendant paid it up.

Q. That was your construction?

A. That was absolutely the way it was agreed on.

This letter that he refers to is plaintiff's Exhibit 19 and is dated January 9th, 1918. The loans referred to, Mr. Keup testifies on page

146 of the transcript, were four different loans on the four different quarters of land. The money was received on the first loan on the 30th day of March in the sum of $1800.00 which was placed to the credit of the defendant in the bank. On April 4th $2200.00, on April 18th $1800.00, on April 24th $2200.00, making a total of $8000.-00 secured on the loans and placed to the defendant's credit in the bank. The amount of money that the plaintiff paid Wells & Dickey Company was $1629.50 and on page 173 of the transcript Mr. Keup says, in reference to that charge against Mr. Wishart's account, "That is the memorandum note of the Wells & Dickey loan." On page 174 of the transcript: "Ordinarily when we take up a loan of that kind, after we get the papers we make a memorandum note of it, just on the typewriter, so in this case it was the William Wishart loan, and we carry it in our case until we get the loan papers."

Q. Then isn't it a fact that the $1629.50 represents the memorandum note for the Wells Dickey mortgage, was charged against Mr. Wishart's account at that time?

A. Yes sir.

Q. And that was on the 4th day of April?

A. Yes sir.

The 4th day of April was the day that $2200.00 was received on the second loan and placed to Mr. Wishart's credit, and charged against his account was the $1629.50 which the plaintiff had advanced in payment of the Wells & Dickey Company loan.

Q. Then Mr. Keup, how do you explain the fact that no part of this loan was used to pay the Wells & Dickey advance that you made?

A. It was used only that—in this way—that when we come to settle and he did not want to make the loan on that quarter then we held the paper as collateral.

Q. But you had charged Mr. Wishart's account with $1629.50?

A. Yes sir.

Q. For the Wells & Dickey money that you had advanced?

A. That we advanced?

Q. Yes. And that was charged against this loan of $8000.00?

A. Yes sir.

Q. That amount was not represented by a check was it?

A. No sir.

Q. And when you made that entry upon your books in the bank, that took that amount of money out of his checking account did it not?

A. Yes sir.

Q. And was it placed back to his checking account?

A. No sir.

Q. Now I will ask you, Mr. Keup, if at any time subsequent to April 4th, 1918 Mr. Wishart was given credit for the sum of $1629.50 to balance this charge?

A. No sir he was not.

On page 168 of the transcript Mr. Keup says that they had a settlement on April 24th, just 20 days after the money advanced to pay the Wells & Dickey loan had been taken out of the defendant's account and on page 169 he says:—"When we had this settlement I asked him—or he said, "My wife and I don't want to mortgage the home farm (the homestead) or make a new mortgage on it because," he said "if I get a crop this fall I will be able to pay it, and if I don't I will give you a mortgage on it." That was in April, 1918. According to his testimony he had regular settlements in the fall every year. They were all friendly. He says he did not ask for any mortgage on the homestead in 1918, that it was not mentioned; that the defendant did sign notes and mortgages but that the homestead was not included and was not mentioned. On page 165 of the transcript Mr. Keup gives the following testimony:—

Q. Now you stated that it was understood, it was agreed that you were to hold the Wells & Dickey papers as collateral and afterwards you testified that Mr. Wishart made no statement authorizing you to hold it, is that correct?

A. I don't know as he made any statement, no.

Q. You would not swear that Mr. Wishart ever mentioned the Wells & Dickey papers to you, stating that you might hold them as collateral?

A. Well, in our agreement it was certainly understood between the two of us.

On this subject the testimony of Mr. Keup always winds up in conclusions. It was "agreed" or it was "understood," but he claims that

he put it in memorandum which was introduced in evidence as Exhibit 16 and which he says was made during the settlement on April 24th, 1918. This Exhibit conflicts with the testimony that we have quoted but he did testify at other times that it was understood, or it was agreed, that the Wells & Dickey note and mortgage might be held as collateral to a note for $7655.10. But when he is asked to state what Mr. Wishart said, his answer is, "Wishart said he and his wife did not want to mortgage the homestead; that if he had a crop that year he would pay it and if he did not he would give a mortgage on the land." In addition to the $1629.50 that the plaintiff took out of defendant's bank account, the defendant gave him a check for $1500.00, the amount due on the mortgage against the Abbott land. This is admitted by the plaintiff and it corroborates the contention of the defendant that out of this loan of $8000.00 there was to be paid the Wells & Dickey mortgage and the amount due on the mortgage against the Abbott land. The defendant had a box in the safety deposit vault of the plaintiff bank where he kept his papers and he states that when he had his settlement with the bank the Wells & Dickey note, mortgage and satisfaction were turned over to him and he placed them in the box in the safety deposit vault of said bank and he says, "I said at that time, 'I thank God that I have got one quarter-section that is free from mortgage' and Mr. Keup says, 'I don't blame you. Keep it free from mortgage.' " So that Mr. Wishart and Mr. Keup both agree that there was something said at that time about the homestead. The defendant states that the Wells & Dickey note and mortgage were in his box in the safety deposit vault of the bank on the 6th or 7th of December, 1921; that he went in on that occasion to get another paper and all of the Wells Dickey papers were in the box at that time; that at that time Mr. Keup called him into his office for the annual settlement. He had a number of notes drawn up secured by a chattel mortgage; that he signed the notes and the chattel mortgage but when he came to examine the real estate mortgage and found that this homestead was included he refused to sign. This was the first time that the defendant was asked to place a mortgage on his homestead. There was a quarrel and he refused to sign it.

On page 94 of the transcript Mr. Keup, referring to the settlement of April 24th, 1918, testified as follows:—

Q. Well by that settlement do you refer now to Exhibit 7? the mortgage for $7655.10?

A. Yes, sir.

Q. So that the amount of the Wells Dickey mortgage is included in that, isn't it?

A. Yes, sir.

So that according to Mr. Keup's testimony he took out of Mr. Wishart's account the sum of $1629.50 the amount advanced to pay the Wells Dickey mortgage together with interest, and then in his settlement on April 24th he included in the mortgage Exhibit 7, the amount of the Wells Dickey mortgage. On further questioning he tells again about what the defendant Wishart said to him in reference to the homestead.

Q. Did you have any conversation with Mr. Wishart at the time Exhibit 7 was made regarding the land described in Exhibit 1?

A. Yes, sir.

Q. What was that conversation?

A. As I recall it, why, he said that he and his wife did not like to have a mortgage on their homestead and I said I didn't blame him and he said if he got a crop that year he would be able to pay it up and that if he didn't he would give a first mortgage loan on the place.

Q. He agreed to pay up what?

A. If he got a crop that year he said he would be able to pay it up and if he did not he would give a first mortgage on the home place.

Mr. Murphy, plaintiff's attorney:—On what place did you say?

A. That is the Wells Dickey mortgaged place.

Q. Was anything said at that time about Exhibit 1?

A. Yes, sir.

Q. What was said?

A. Just what I told you.

Q. You mean that he referred to Ex. 1 as the mortgage that he was to pay with the crop?

A. Yes, sir.

Q. He did not refer to Exhibit 7?

A. No, sir.

Q. Well, did you ever ask him to make a first mortgage on his home place?

A. No, sir.

And on page —— of the transcript:——

Q. What I am asking you is if he said anything about authorizing you to hold Exhibit 1 as collateral to Exhibit 7?

A. It was understood that way.

Q. He did not say that?

A. We did not have any other way of holding it except he gave us a new note.

Q. I am asking you whether in this conversation he authorized you to, or told you that you could, hold it as collateral to Exhibit 7?

Mr. Murphy, plaintiff's attorney: Did you mean in January or April?

Hommes: I am asking you if he ever had any such conversation.

Witness: I certainly did, in April.

Q. Then you wish to be understood as saying that Mr. Wishart told you that you could hold exhibit 1 as collateral to exhibit 7?

A. That was what we agreed upon in April.

Q. Now Mr. Keup, did he say that?

A. I don't know whether he said so in so many words, no.

On page 159 of the transcript, referring to the attempted settlement in December, 1921, in answer to questions asked by plaintiff's attorney, Mr. Keup testified as follows:——

Q. Now you heard testimony of Mr. Wishart to the effect that there was some apparent feeling there expressed by you, some disagreeable quarreling or something, in December. Was there anything to that?

A. Well, all there was to it was, when he said his wife wouldn't sign it, I said, "I aint asking your wife to sign it, I am asking you to sign it, Bill" and he threw up the mortgage and jumped up and I jumped up. And he said he didn't agree to give any mortgage on that place and I said you did.

Q. On what land?

A. On this home place. And I said "If you say you didn't you are a liar."

On page 96 of the transcript Mr. Keup testifies as follows:—

Q. Did you request from the Wells Dickey Company an assignment of this note and mortgage prior to January, 1922?

A. No, sir.

According to the records of the bank and the testimony of Mr. Keup the Wells Dickey mortgage was paid on the 4th day of April, 1918. He states in his testimony that the Wells Dickey mortgage and note was to be held as collateral until the new loan was made or until the Wells Dickey mortgage and note were paid. The receipts of a part of the new loan were received April 4th, 1918, and upon that date the plaintiff took out of the new loan, which had been placed in the checking account of the defendant in the plaintiff bank, the full amount of the Wells Dickey loan with interest.

It so appears upon the books of the plaintiff bank; it is in accordance with Mr. Keup's testimony, from which it appears that the Wells Dickey loan was paid. If the agreement was that the Wells Dickey note and mortgage should be held as collateral until the new loan was made or until it was paid then all the terms of the agreement were complied with when the loan was made and the plaintiff bank was reimbursed out of the loan for the money advanced by the plaintiff bank to Wells & Dickey Company in payment of mortgage and note. This conclusion is also in accordance with the testimony of the defendant, and it follows that the plaintiff has no cause of action against the defendant. The judgment of the lower court is reversed with instructions to dismiss the action.

CHRISTIANSON, Ch. J., and BIRDZELL, JOHNSON, and NUESSLE, JJ., concur.